IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 4, 2021 Session

**STATE OF TENNESSEE v. VINCENT WILLIAMS**

**Appeal from the Criminal Court for Shelby County**
**No. 17-05748     Chris Craft, Judge**

_____

**No. W2020-01500-CCA-R3-CD**

_____

The Defendant, Vincent Williams, was convicted by a jury of attempted first-degree murder, employing a firearm during the commission of a dangerous felony, and aggravated assault, for which he received an effective forty-year sentence.  On appeal, the Defendant argues that the trial court committed plain error when it prevented him from introducing evidence of the victim's bias and that the evidence was insufficient to establish his identity as the perpetrator.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Phyllis L. Aluko, District Public Defender, and Barry W. Kuhn, Assistant District Public Defender (on appeal); and Ann L. Schiller and Steffen Schreiner (at trial), Memphis, Tennessee, for the appellant, Vincent Williams.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Melanie H. Cox and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case arises from the November 2016 drive-by shooting of Ronnie Jones ("the victim") while he was walking on the McLemore Avenue Bridge in Memphis.  In relation to this shooting, the November 2017 term of the Shelby County Grand Jury charged the Defendant with attempted first-degree murder, employing a firearm during the commission

of a dangerous felony, to wit: attempted first-degree murder, and aggravated assault. See Tenn. Code Ann. §§ 39-13-101, -13-102, -13-202, -17-1324. The Defendant's identity as the shooter was the main issue at trial.

At the outset of trial, the trial court conducted a jury-out hearing to determine whether the Defendant could impeach the victim with evidence of the victim's assault of Sandra Brown on August 14, 2016, which occurred about three months prior to this shooting. The Defendant alleged that the victim, knowing that the Defendant was to serve as a witness against him for the assault, had motive to pick out the Defendant, rather than the true perpetrator, as his shooter, in an effort to derail the assault prosecution.

Certain facts surrounding the assault prosecution were established at the hearing. The victim was indicted on March 30, 2017, for the aggravated assault of Ms. Brown. It was observed that the State's "entire file" regarding the victim's assault of Ms. Brown lacked any mention of the Defendant. Furthermore, the State's only listed witnesses were Ms. Brown[1] and Keith Crum, both of whom were subpoenaed for the preliminary hearing, but failed to show up. The case was dismissed for lack of prosecution after the witnesses failed to show, though it was later presented to the grand jury and resulted in an indictment for aggravated assault. Ultimately, the victim pled guilty to misdemeanor assault of Ms. Brown.

The Defendant was allowed to make an offer of proof to establish his claim of bias. John Simmons testified that he lived next to the apartment complex where the victim and Ms. Brown lived and the Defendant frequented. Mr. Simmons described the apartment complex as a "tight knit" community of fourteen apartments, where "[e]verybody [knew] everybody." Mr. Simmons recalled the day when he was told that the victim was "jumping on" Ms. Brown and walked to the apartment complex's courtyard to see what was happening. By the time Mr. Simmons arrived, the fight was over; the victim and Ms. Brown were still arguing "back and forth"; the victim was walking upstairs and "talking mess"; and Ms. Brown was saying that she would call the police. Mr. Simmons recalled that the Defendant was sitting in a chair upstairs and that many of the apartment complex's residents had come out to observe the events, including Mr. Crum and James Reid.

The police arrived on the scene to speak with the apartment complex's residents; however, Mr. Simmons only spoke with the Defendant that day, who relayed the details of the assault to Mr. Simmons. The Defendant told Mr. Simmons that he had seen the assault and that he was willing to testify on behalf of Ms. Brown; according to Mr. Simmons, this was "a known fact" in the apartment complex. Mr. Simmons confirmed that he never

---

[1] The prosecutor referenced a male victim named Hunter Brown. It is unclear from the record to whom the prosecutor was referring.

discussed Ms. Brown's assault with the victim and that he never heard the Defendant talk about the assault with the victim.

The Defendant testified that he had witnessed the victim's assault of Ms. Brown, along with Mr. Crum and Mr. Reid. According to the Defendant, he saw the victim pick up Ms. Brown by the neck and "choke-slam" her onto the ground; Mr. Crum broke up the fight; and the police arrived afterward. The Defendant admitted, however, that he never spoke with the police about the fight, that he never gave a statement about the incident, and that he was never asked to go to court to support a case against the victim. The Defendant also admitted that he never told the victim that he planned to testify against him in court or that he had even witnessed the fight.

Rather, the Defendant asserted that he told Ms. Brown and Ms. Brown's fiancé that he would testify on her behalf. According to the Defendant, Ms. Brown's fiancé and the victim "had some words," and Ms. Brown's fiancé informed the victim of the Defendant's intention to testify. The Defendant believed that Mr. Reid had also relayed the information to the victim. The Defendant testified that it was "kind of common knowledge" among the apartment complex's residents and that he believed that the information did "[get] back" to the victim.

After hearing this evidence, the trial court declined to allow in the evidence of the assault of Ms. Brown. The trial court, referencing the prejudice standards of Tennessee Rules of Evidence 403 and 404(b), believed the evidence to be unduly prejudicial because there was no proof that the Defendant ever cooperated with the police regarding the victim's assault prosecution. The trial court further found that there was no proof the victim ever knew about the Defendant's alleged willingness to serve as a witness against him. The trial court noted that it was "tentative" at best that the victim was more willing to strike back at the Defendant for supporting a prosecution than to seek justice against the true culprit who shot him four times. Accordingly, the Defendant had not sufficiently shown the basis for the victim's claimed bias, which otherwise seemed highly unlikely under the circumstances. In addition, the trial court observed that the evidence was "very prejudicial" to the State because it would establish that the victim in this case was charged with aggravated assault, though he was ultimately convicted of a misdemeanor.

The trial proceeded. The victim testified that he was living in a small apartment complex in Memphis, that he was familiar with Mr. Simmons, who lived in a nearby house, and that the Defendant was a frequent visitor to the complex. In November 2016, the victim had begun planning his birthday celebrations and bought a camcorder from Mr. Simmons for $20 so that he could record the event. On November 4, 2016, the Defendant came to the victim's apartment and claimed ownership of the camcorder, which the Defendant alleged Mr. Simmons should never have sold in the first place. The victim

refused to give up the camcorder unless the Defendant reimbursed him the $20; however, the Defendant refused and departed angrily.

The victim testified that sometime between 11:00 a.m. and 12:00 p.m. on November 5, 2016, he was in the parking lot of the apartment complex talking with his neighbors when the Defendant confronted him and again demanded that he return the camcorder. According to the victim, they argued, and a fist fight, instigated by the Defendant, ensued. The fight lasted three to four minutes. After the fight was broken up, the Defendant got into his car, a brown, four-door Cadillac Seville. The victim stated that the Defendant came at him "full speed" as he drove away and attempted to run into him. The victim said that he jumped on top of another car to avoid being run over, but was still hit in the leg. The victim said that he suffered some bruising when he was hit, but was otherwise uninjured. The Defendant also ran into several other cars as he left.

The victim stayed home for the rest of the day hoping to avoid the Defendant. Later that evening, around midnight, the victim left his apartment to walk to a nearby store to buy cigarettes. As the victim walked over a bridge on McLemore Avenue, he observed the Defendant driving up from behind him in the Defendant's Cadillac. According to the victim, the Defendant stopped the car next to him, rolled down the driver's side window, looked the victim in the face, and said, "You must not know who you're f--king with." The Defendant then raised a black handgun and shot the victim in the right leg, the right arm, and twice in the abdomen before driving off. The victim lain on the bridge for several minutes crying for help before good Samaritans came to assist him.

The police were called, and Officers with the Memphis Police Department ("MPD") began to arrive during the early morning hours of November 6, 2016. When they arrived, the victim was conscious, though his breathing and speech were labored. MPD Officer Nathan Caudell spoke with the victim both while the victim was lying on the ground and once the victim was inside the ambulance. MPD Officer Gary Lawson also spoke with the victim and others present on the scene. The victim told the officers that he had been shot by "Vincent," a Black male with an afro-styled hairdo driving a brown Cadillac. Mr. Crum, who had arrived on the scene by that time, informed the police that the Defendant, whose first name was Vincent, owned a brown Cadillac. Further investigation revealed that the Defendant owned a 1988 Cadillac, but the police were unable to find the Defendant or the Cadillac at any of the locations they determined were associated with the Defendant.

Following the shooting, the victim was admitted to the intensive-care unit and underwent multiple surgeries. A few days after the shooting, on November 8, 2016, MPD Sergeant Ben Grogan went to the hospital and showed the victim a photographic lineup. Sergeant Grogan agreed that at the time of this lineup, the victim was in a weak state, slightly sedated, and could barely talk. Nonetheless, fearful that the victim would die before an identification could be made, Sergeant Grogan decided to administer the first

lineup. Though the victim was too weak at the time to write, the victim identified the Defendant as his assailant by tapping on the Defendant's picture and whispering, "Vincent." Sergeant Grogan confirmed that he, not the victim, made all the markings on the lineup because the victim was physically unable to do so.

A few days later, on November 11, Sergeant Grogan returned to the hospital when the victim's condition had improved and presented the victim with another photographic lineup with a different photograph of the Defendant in a different position. This time, the victim was able to write on the lineup and note the photograph he identified as depicting his shooter: "Vinsent [sic] Shot me four time Behind." The victim also identified the Defendant as his shooter in court.

The victim acknowledged that he had been convicted of robbery in February 2013. Furthermore, on cross-examination, the victim admitted that he originally told police that the fight with the Defendant was over a video game, not a camcorder, because the Defendant had "boosted" the price on him. He explained that he did so because he did not want the police to know much about his business and that he meant to say video camera. The victim admitted that his recollection of the timing of the shooting was imprecise and that he originally testified at the preliminary hearing that the shooting occurred between 8:00 and 9:00 p.m. He further confirmed that he testified at the preliminary hearing that he did not see any handgun, though he insisted that his response was inaccurate. In addition, the victim acknowledged that he had been in the crosshairs of gunfire twice before in incidents unrelated to the Defendant.

The police did not find shell casings, bullet strike marks, or any other physical evidence at the crime scene, though Officer Caudell explained that the shell casings may have remained inside the car. It further did not appear that the victim had been robbed of any property. In addition, Officer Caudell did not recall any pool of blood around where the victim was lying. There were no other witnesses to the shooting besides the victim. Sergeant Grogan admitted that it was unusual to administer two different photographic lineups and that the victim did not sign an advice-of-rights form for either lineup, even though signing them was standard procedure. Motor-vehicle records, moreover, showed that the Defendant owned a red Cadillac, not a brown one. The Defendant was not apprehended for several months after the shooting.

The Defendant called two witnesses in his defense. Mr. Simmons, the Defendant's friend since elementary school, testified that the victim took the camcorder in question from Mr. Simmons's apartment without permission. When he discovered that it was missing, Mr. Simmons went to the victim's apartment and confronted him about the camcorder. Mr. Simmons and the victim left the victim's apartment searching for the Defendant to discuss ownership of the camcorder. As they were walking downstairs around 8:30 p.m., the victim encountered the Defendant and "head-butted" him; a fight

ensued.  According to Mr. Simmons, the victim was the aggressor of the fist fight, not the Defendant.  After Mr. Simmons helped break up the fight, he drove the Defendant to the Defendant's sister's house, dropping off the Defendant there about 9:00 p.m.

When Mr. Simmons returned home, he heard a single gunshot and, shortly thereafter, was informed that the victim had been shot.  Mr. Simmons went to the crime scene where the police were present, but he did not speak with them.  Mr. Simmons said that he called the Defendant's fiancée, who gave her phone to the Defendant, and that he told the Defendant that the victim had been shot.  Mr. Simmons opined that the Defendant did not shoot the victim.

Mr. Simmons further claimed that the Defendant's Cadillac was missing a motor and was consequentially non-operational in November 2016.  Mr. Simmons said that he often drove the Defendant around.  Relatedly, Mr. Simmons denied that the Defendant ever attempted to run the victim down with the non-operational car.  Mr. Simmons indicated that an "older dude" in the neighborhood owned a Cadillac that looked much like the Defendant's and that he had even once mistaken it for the Defendant's car.

The Defendant's fiancée, Vera Weston, testified that on November 5, 2016, she dropped off the Defendant at Mr. Simmons's house and then continued on to visit the Defendant's sister, Edna, around 1:00 p.m.  Later, Mr. Simmons dropped off the Defendant at Edna's house.  The Defendant and Ms. Weston remained at his sister's house for about thirty minutes before returning to their house around 9:30 or 10:00 p.m.  Ms. Weston said that they rode in her silver Lexus that evening because the Defendant's Cadillac was missing a motor.  She claimed that if the Defendant needed to drive somewhere, she would drive him or he would have to get a ride from someone.  According to Ms. Weston, the Defendant's non-operational Cadillac was parked at his sister's house and had been there for months.

Ms. Weston further averred that after working on the house for a while, she and the Defendant retired for the evening around 11:00 p.m.  Around midnight, Mr. Simmons called them to say that the victim had been shot.  She woke up next to the Defendant who, to her knowledge, had spent the entire night with her.  She admitted that she never spoke to the police to relay this information to them.

Ms. Weston proclaimed that she had not discussed the details of the case with the Defendant.  In rebuttal, the State entered recordings of jail conversations between the Defendant and Ms. Weston.[2]  During the calls, the Defendant and Ms. Weston discussed details of the case, including the Defendant's repeatedly telling Ms. Weston "when it happened and everything like that."  It was also mentioned multiple times during the calls

---

[2] The recordings are not a part of the appellate record.

that the Defendant had written Ms. Weston a letter, though the Defendant did not want to talk about the details of the letter over the phone. The last phone call occurred during trial, and the Defendant recounted to Ms. Weston the testimony from the State's witnesses.

After the close of proof and during deliberations, the jury noted that it was having difficulty coming to a unanimous verdict because the physical evidence did not corroborate the victim's testimony. The trial court responded to the jury by re-reading the unanimous verdict instruction. Thereafter, about one hour after resuming deliberations, the jury resolved these differences and convicted the Defendant as charged. The trial court, as thirteenth juror, approved the verdict and sentenced the Defendant to an effective forty-year sentence. This appeal followed.

## ANALYSIS

On appeal, the Defendant contends that the trial court committed plain error when it refused to allow him to present evidence of the victim's alleged bias. He also challenges the sufficiency of the evidence supporting his convictions, specifically as it relates to proof of his identity as the perpetrator of these offenses. We will address each in turn.

### I. Evidence of Victim's Bias

The Defendant contends that the trial court committed plain error by refusing to allow him to introduce evidence of the victim's bias pursuant to Tennessee Rule of Evidence 616. Specifically, the Defendant sought to cross-examine the victim, as well as present testimony from Mr. Simmons, about the prior assault of Ms. Brown. The Defendant averred that he witnessed the victim's assaulting Ms. Brown and that he had expressed his intention to testify in support of Ms. Brown. According to the Defendant, this evidence tended to show that the victim was biased towards the Defendant and had motive to lie and falsely accuse the Defendant in retaliation. The State responds that the Defendant has not established any error in this regard, much less plain error.

We agree with the parties that full appellate review of this issue is waived because the Defendant failed to raise the issue in his motion for new trial. See Tenn. R. App. P. 3(e) (treating issues "upon which a new trial is sought" as waived "unless the same was specifically stated in a motion for a new trial"); see also State v. Harbison, 539 S.W.3d 149, 164 (Tenn. 2018) (citations omitted). Therefore, we review this issue solely to determine if plain error review is warranted.

The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

The crux of the Defendant's argument is that the trial court erred by engaging in the balancing tests of Rules 403 and 404(b) and concluding that the evidence was unduly prejudicial because there was no proof that the Defendant ever cooperated with police in the assault case or that the victim ever knew of the Defendant's willingness to serve as a witness against him. According to the Defendant, the evidence purportedly showing the victim's pre-existing bias should have been admitted pursuant to Rule 616 without examination of the proof's probative value versus its prejudicial effect. He further insinuates that his right to a trial by jury was violated.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b)[3] provides that evidence of other crimes, wrongs, or bad acts are not admissible to prove character to show action in conformity with that character but may be admissible for "other purposes," assuming certain conditions are met:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

---

[3] The rules governing Rule 404(b) now apply to "any individual" following the legislature's enactment of Tennessee Code Annotated section 24-7-125. See State v. Christian Blackwell, No. W2018-01233-CCA-R3-CD, 2019 WL 2486228, at *6 (Tenn. Crim. App. June 13, 2019); State v. Devin Buckingham, No. W2016-02350-CCA-R3-CD, 2018 WL 4003572, at *14 (Tenn. Crim. App. Aug. 20, 2018).

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Some examples of "other purpose[s]" for which such evidence may be admitted include motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004).

Tennessee Rule of Evidence 616 provides that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Common examples of bias or prejudice include promises of leniency made to a witness, threats made against a witness, a witness's personal stake in the outcome of the litigation, a witness's settlement or pending settlement with a party involved in the litigation, a witness's relationship to a party in the lawsuit, a witness's motives for testifying, a witness's relevant mental health problems, and racial animosity. Hunter v. Ura, 163 S.W.3d 686, 699 (Tenn. 2005) (citing Neil P. Cohen, et al., Tennessee Law of Evidence § 6.16[4] (4th ed. 2000)).

Witness credibility is always a relevant issue. State v. Jereco Tynes, No. W2010-02511-CCA-R3-CD, 2013 WL 1043202, at *11 (Tenn. Crim. App. Mar. 13, 2013). As noted by the Advisory Commission Comment to Tennessee Rule of Evidence 616, "Bias is an important ground for impeachment." "The right to explore or examine witnesses for bias is a fundamental right." State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). Furthermore, "[a]n undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and [a]rticle I, [s]ection 9, of the Tennessee Constitution." Id. However, "[w]hile the right of cross-examination is fundamental, its exercise is controlled by the discretionary authority of the trial judge." State v. Zirkle, 910 S.W.2d 874, 890 (Tenn. Crim. App. 1995). We will uphold the trial court's decision absent an abuse of discretion. Id.

The case law is clear that like the other rules of evidence, Rule 616 is subject to Tennessee Rule of Evidence 403[4] analysis. See State v. Leach, 148 S.W.3d 42, 55-57 (Tenn. 2004) (evaluating a Rule 616 issue, under plain error review, by employing Rule 403's weighing test of probative value versus prejudicial effect); see also State v. Felipe Gonzales, No. W2017-00941-CCA-R3-CD, 2018 WL 5098204, at *15-16 (Tenn. Crim. App. Oct. 10, 2018); State v. Nehad Sobhi Abdelnabi, No. E2017-00237-CCA-R3-CD, 2018 WL 3148003, at *17-18 (Tenn. Crim. App. June 26, 2018). This court has specifically noted that "regardless of whether the witness admits or denies the bias, counsel

---

[4] Though the trial court cited to both Rules 403 and 404(b), we note that Rule 403 is the more restrictive balancing test in that Rule 403 requires prejudice "substantially" outweigh the probative value before the evidence is excluded. In practical terms, then, exclusion is more difficult under Rule 403.

is not precluded from introducing extrinsic evidence to further illustrate the witness's bias <u>if the proposed evidence complies with the remaining rules of evidence</u>." <u>Fred Thompson, Jr. v. State</u>, No. M2009-02457-CCA-R3-PC, 2011 WL 1197620, at \*10 (Tenn. Crim. App. Mar. 31, 2011) (emphasis added).

Here, the Defendant's offer of proof failed to establish the factual links necessary to show the victim's bias towards the Defendant; i.e., that the Defendant was cooperating with police to prosecute the victim for Ms. Brown's assault or that the victim was aware of the Defendant's cooperation. The trial court reasonably found as tenuous the Defendant's claim that the victim was more willing to strike back at the Defendant for supporting the victim's prosecution in an unrelated assault than to seek justice against the allegedly true culprit of the attempted murder. The proof had little probative value to impeach the victim for bias. On the other hand, the evidence was unfairly prejudicial to the State because the Defendant would have been putting on proof that the victim, who had beaten up at least one woman in an unrelated matter, was a bad person and, therefore, should not be believed. We cannot say that the trial court abused its discretion in refusing to allow the Defendant's evidence concerning Ms. Brown's assault.

In addition, the Defendant was able to put on a vigorous defense by cross-examining the State's witnesses, including questioning the victim about his inconsistent statements and his lying to the police. The Defendant also elicited the victim's conviction for robbery and showed that the victim had been shot at before. In addition, the Defendant presented his own witnesses to try to establish an alibi and to contradict the victim's version of events. Both defense witnesses testified that the Defendant's Cadillac was inoperable; therefore, he could not have driven up behind the victim to shoot him. Accordingly, we conclude that no clear and unequivocal rule of law has been breached, that a substantial right of the accused was not adversely affected, and that consideration of the error is not necessary to do substantial justice.

## II. Sufficiency

The Defendant contends that the evidence of his identity was insufficient. The Defendant submits that the victim was not credible, noting that "[t]here was no one else on the scene" and that "there was no physical evidence on the scene that would help identify the shooter." The Defendant does not challenge the other elements of the offenses. The State disagrees, responding that the victim's testimony alone was sufficient to support the convictions and that credibility determinations are within the jury's province.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319

(1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

"The identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as a perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). Identity may be established by either direct evidence or circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793; see also State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010). The identification of the defendant as a perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

In this case, the victim testified that on the night in question, as he was walking to buy cigarettes, he saw the Defendant, in the Defendant's Cadillac, drive up behind him on the McLemore bridge. The victim said that the Defendant stopped right next to him, rolled down the car window, and said, "You must not know who you're f--king with." According to the victim, the Defendant then raised a black handgun and shot him repeatedly. The victim consistently identified the Defendant as the shooter—on the scene, in two

- 11 -

photographic lineups, and at trial. Moreover, the State established as a motive for the Defendant's attack that the two men were engaged in a dispute over the camcorder.

A victim's testimony alone is sufficient to support a defendant's conviction and requires no corroboration. See State v. Elkins, 102 S.W.3d, 582-83 (Tenn. 2003) (concluding that the evidence was sufficient to support a conviction for rape of a child, despite the fact that the victim's testimony contained some inconsistencies). The Defendant thoroughly cross-examined the victim and presented a vigorous defense. The jury, by its verdict, credited the victim's identification despite the lack of physical evidence at the scene, and we will not disturb its credibility determination. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's convictions.

## CONCLUSION

In accordance with the foregoing, we conclude that the Defendant's issue regarding the victim's alleged bias does not entitle him to plain error relief and that a reasonable jury could have determined that the State sufficiently proved the Defendant's identity as the perpetrator. Accordingly, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE